**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
YOLANDA THOMPSON,

|                                          |                              |
|------------------------------------------|------------------------------|
| Plaintiff,                               | **COMPLAINT**                |
| -against-                                | **PLAINTIFF DEMANDS**        |
| THE COUNTY OF SUFFOLK, NEW YORK, and STEVE | **A TRIAL BY JURY**        |
| BELLONE, *in his official capacity*,     |                              |
|                                          |                              |
| Defendants.                              |                              |

----------------------------------------------------------X

Plaintiff YOLANDA THOMPSON, ("Plaintiff"), by and through her attorneys PHILLIPS

& ASSOCIATES, ATTORNEYS AT LAW, PLLC, hereby complains of the Defendants, THE

COUNTY OF SUFFOLK and STEVE BELLONE, upon information and belief, alleges and avers

as follows:

## NATURE OF THE CASE

1.  Plaintiff brings this action alleging that the Defendants have violated the Americans with
    Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*, as amended, ("ADA"), the
    Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq., as amended, ("Rehabilitation Act"),
    and the New York State Human Rights Law, New York State Executive Law §§ 290 *et
    seq.* ("NYSHRL"), and seeks damages to redress the injuries she has suffered as a result of
    being discriminated against by her employer on the basis of her disability, subjecting her
    to a disability-based hostile work environment, failing to provide a reasonable
    accommodation, and wrongfully terminating her employment because of her disability, and
    in retaliation for engaging in protected activity.

## JURISDICTION AND VENUE

2.      Jurisdiction of this Court is proper under 42 U.S.C. §§ 12101 *et seq*., and 28 U.S.C. §§ 1331 and 1343.

3.      The Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), as it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## **PROCEDURAL PREREQUISITES**

5.      Plaintiff filed a Charge of Discrimination with the New York State Division of Human Rights ("NYSDHR"), which was dually filed with the Equal Employment Opportunity Commission ("EEOC"), on February 2, 2022, within 300 days of her discriminatory termination.

6.      On March 10, 2022, Plaintiff requested her Charge of Discrimination be removed from the NYSDHR, but remain at the EEOC for processing, so that she could pursue her federal claims.

7.      Plaintiff received a Notice of Right to Sue from the EEOC on July 18, 2022.  A copy of the Notice is annexed hereto as Exhibit A. This action is being commenced within 90 days of the issuance of the Notice of Right to Sue.

8.      A Notice of Claim was filed with The County of Suffolk on March 31, 2022, less than 90 days after the last day of discrimination. A deposition of Plaintiff was taken pursuant to Section 50-H of the General Municipal Law on June 9, 2022.

## **PARTIES**

9.      Plaintiff is a female who lives in the State of New York, County of Suffolk.

10.     Plaintiff is a person that is hard of hearing, which was first diagnosed during Plaintiff's

childhood.

11. Plaintiff's profound hearing impairment substantially impacts the major life activity of hearing, meeting the definition of disability under the ADA and the NYSHRL.

12. Defendant, the County of Suffolk, New York ("Suffolk County"), is a governmental body overseeing 10 municipalities including the County Center in Riverhead, New York.

13. Defendant Suffolk County has more than 500 employees.

14. Defendant Suffolk County is a recipient of federal funding for its programs and services.

15. Defendant Steve Bellone is the Suffolk County Executive and therefore oversees all governmental functions of Defendant Suffolk County.

16. Plaintiff was an employee of Defendant Suffolk County at all relevant times and was capable of performing the essential functions of her job, with or without a reasonable accommodation.

## **MATERIAL FACTS**

17. On or around April 4, 2021, Plaintiff interviewed with Defendant Suffolk County for the full-time position of Account Clerk in the Finance Department of the Department of Public Works, which paid approximately $32,600 annually.

18. During her interview with Charles Jaquin ("Jaquin"), the Director of the Finance Department, and Jenine Schlosser ("Schlosser") Head Clerk of the Finance Department, Plaintiff disclosed that she had a hearing disability and explained that telephone use could pose some difficulty for her unless she could use an assistive device.

19. Plaintiff was assured by the interviewers that there would not be a problem accommodating her on the job and they could provide Plaintiff with the appropriate phone she needed.

20. After being offered and formally accepting the job on or around April 12, 2021, Plaintiff

emailed Schlosser regarding the accommodation issue they had discussed during the interview.  Schlosser responded to her email stating, "We will take care of this."

21.     Plaintiff began working as Account Clerk on May 3, 2021, and was trained by Schlosser.

22.     Schlosser, as the Head Clerk, was Plaintiff's direct supervisor.  Schlosser had the authority to hire, fire, and affect the terms, conditions, and privileges of Plaintiff's employment or to influence the decisionmakers of the same.

23.     Plaintiff's job duties entailed carrying out accounting and reconciliation protocols and procedures related to vendor services for the Department of Public Works.

24.     During training, Schlosser told Plaintiff that until they found an accessible phone Plaintiff could use email to contact those she needed to communicate with for her job, such as vendors.

**Full-time Position: Searching for a Phone Accommodation**

25.     Soon thereafter, Plaintiff took it upon herself to contact her hearing aid provider who ordered her a CapTel closed-captioning phone.

26.     A CapTel phone is an assistive device for those with hearing related disabilities.  A CapTel phone works by automatically connecting to a Captioned Telephone Service ("CTS") when a call is made. The CTS transcribes both sides of the telephone conversation, which appears in text on the phone screen, allowing the person with a hearing disability to read the transcription in real time.

27.     Unfortunately, after the CapTel phone was set up by the IT associate Dave Petrie ("Petrie"), it turned out not to be helpful, as the captions were not accurate and were not appearing in real time.

28.     Plaintiff suggested they try a different brand phone, Clear Captions, but this phone was

also not providing accurate or real time captioning.

29. Attempting to find an appropriate accommodation for her disability, Plaintiff next went to Best Buy on her own time and purchased a Bluetooth compatible phone that worked with her hearing aids. Yet, when Petrie installed this new phone, it appeared that it did not pair with Plaintiff's hearing aids' Bluetooth as advertised.

30. Finally, Plaintiff began using her personal iPhone, as she knew it had the capability to pair with her hearing aids' Bluetooth. Plaintiff downloaded an app that transcribes calls on the iPhone and, in this way, she was able to interact with vendors via phone.

31. Plaintiff was concerned about her privacy when using her own phone, because her contact information appeared when calling, and she was not being compensated for the business use of her personal phone and cell service.

32. Plaintiff, with or without the use of an assistive device, was a good employee, performing her job duties responsibly and effectively.

33. On or about July 12, 2021, Plaintiff informed Schlosser that, due to familial obligations, she was no longer able to work full time and would be resigning her position.

34. Schlosser told Plaintiff, in sum or substance, that she was a good worker and Schlosser did not want to lose her as she "needed her brains."

35. Schlosser inquired whether Plaintiff would be open to working a part time with a flexible schedule if she could get authority to arrange it. Plaintiff said yes.

36. In conjunction with her separation from employment, Plaintiff was asked to complete an "exit interview" form. Schlosser told Plaintiff, in sum or substance, not to write anything negative on the form, as any complaints she made could interfere with Schlosser's ability to get permission for Plaintiff to return part-time.

37. Plaintiff filled out the form with as many "positive" responses as she could even though she had found Schlosser to often be difficult and to not be patient or responsive regarding accommodating Plaintiff's disability.

38. For instance, during the initial training by Schlosser, she seemed irritated by Plaintiff's disability. Schlosser expressed frustration, because as she said, in sum or substance, she could not tell whether Plaintiff was hearing her well enough.

39. Plaintiff did struggle at times to take notes during training as her ability to comprehend relied upon watching the lips and face of the person speaking to her, as well as concentrated listening. This issue was further exacerbated by the wearing of masks in the office, which covered the speaker's lips and muffled the sound.

40. Plaintiff asked Schlosser for a written training manual so that Plaintiff could read and study at night. Schlosser told Plaintiff repeatedly that there was no training manual, she would be required to take notes and learn as she went. Schlosser told Plaintiff that the learning curve for anyone to get the full-hang of the position was at least a year.

41. The last day Plaintiff worked as a full-time employee was July 16, 2021, three months after starting.

**Part-time Position: Disability-related Taunting and a Failure to Accommodate**

42. Just weeks after her departure, Schlosser offered Plaintiff the opportunity to return to the same position, but working a schedule of 35 hours bi-weekly, and Plaintiff accepted.

43. Schlosser indicated she preferred Plaintiff work Mondays, Tuesdays, and Thursdays of each week, but could allow Plaintiff to change the days and start times as needed.

44. Upon Plaintiff's first day back in the office, August 23, 2021, she immediately sensed a change in the previously friendly atmosphere of the workplace. She soon learned that due

to a certain employee's departure, the workload for Schlosser and several others had substantially increased.

45. Schlosser informed Plaintiff that she knew she needed to finish Plaintiff's training and it was causing her great stress.

46. Unlike during the previous period of employment, Plaintiff began to feel unwelcome due to her disability and that Schlosser now viewed her as a "problem."

47. Schlosser began referring to Plaintiff as the "deaf one," causing Plaintiff discomfort and humiliation.

48. When Schlosser introduced Plaintiff to coworkers, she described her as being "deaf," causing Plaintiff to be embarrassed. Plaintiff's coworkers were also made to feel uncomfortable as Plaintiff repeatedly corrected Schlosser to explain that she was hard of hearing, not deaf.

49. To get Plaintiff's attention during the day, Schlosser would bang loudly on Plaintiff's metal file cabinets or cubicle wall. Schlosser would also hit Plaintiff's leg or arm to get her attention. This discriminatory conduct left Plaintiff feeling disrespected and embarrassed.

50. Plaintiff spoke to Schlosser about how badly her actions were making her feel. Plaintiff explained to Schlosser on several occasions that she just needed to come closer to Plaintiff or lightly tap her shoulder to get her attention.

51. Schlosser acted indifferently to Plaintiff's complaints and indicated she didn't see what was wrong with her behavior.

52. In addition to feeling personally humiliated, Schlosser's antagonistic and disrespectful treatment of her in front of the entire office was undermining Plaintiff's ability to develop good rapport and establish herself with her co-workers.

53.     Schlosser also spoke openly in the office area, in front of everyone, about the ongoing phone accommodation issue, making Plaintiff feel singled-out and as if she as a person with hearing loss and her accommodation request were a burden.

54.     Plaintiff asked Schlosser on multiple occasions to speak to her about such matters in her private office only. Schlosser did not honor her request and continued to discuss , Plaintiff's disability accommodation request in non-private areas, violating her privacy rights and the confidentiality provisions of the law.

55.     With the assistive phone device issue still unresolved after Plaintiff's return, a request for a County-issued iPhone that paired correctly with Plaintiff's hearing aids was finally submitted.

56.     In the meantime, Schlosser began placing a new, unjustified and heightened level of scrutiny on Plaintiff's work, nitpicking tiny errors.  Schlosser chided Plaintiff for these small mistakes in front of all staff, speaking to her loudly and slowly, as if Plaintiff were a child, when something needed to be corrected.

57.     As the months wore on, the disability-based hostile work environment was causing Plaintiff tremendous distraction and anxiety, interfering with her ability to concentrate and work effectively.

58.     In addition, the County failed to provide the iPhone ordered, and Plaintiff was required to rely on her own personal iPhone to do her job or to resort to email only communications to vendors and others.

59.     In an apparent reversal in position, Schlosser now found email communication unacceptable, and while not doing anything to ensure Plaintiff received her phone accommodation, Schlosser began to yell at Plaintiff, saying that she needed to be calling

vendors on the phone. Plaintiff understood this to be an attempt to further criticize her.

**Formal Complaints of a Disability-Based Hostile Work Environment**

60.     Finally, on or about December 20, 2021, Plaintiff asked to have a private meeting with Schlosser in her office with the door closed.  Schlosser reluctantly agreed.

61.     Plaintiff complained of Schlosser's belittling conduct and how it was making her feel. Schlosser reacted defensively saying, in sum or substance, that that is how she treats everyone.

62.     Plaintiff told her, in sum or substance, that not everyone had a disability such as hers, and that extra care was warranted regarding how Schlosser referred to her and spoke of her.

63.     Schlosser lunged out of her chair towards Plaintiff, pointed a finger in her face, and said, in sum or substance, "How dare you accuse me of treating you or your disability disrespectfully, especially after I ensured you could return to the job part time."

64.     Schlosser went on in a raging tone of voice, stating in sum or substance, that she was extremely stressed and was even working on Saturdays due to the amount of work that needed to be completed.  Schlosser went on to state that she didn't have time for Plaintiff's complaints or to continue to train her.

65.     On or about December 13, 2021, feeling tremendously upset and defeated, Plaintiff requested a meeting with Debbie Riggio Smith ("Smith"), the Human Resources Director at Defendant Suffolk County.

66.     Plaintiff complained to Smith about the unprofessional, abusive, and humiliating conduct she was being subjected to due to her disability. Plaintiff asked Smith if there was any sensitivity training related to disabilities.  Smith said there had been something years ago for employees to watch. Smith seemed to sympathize with Plaintiff, reassuring her that she

was not the problem, telling her that her department was referred to as the "crazy department" by others.

67.    Smith also asked Plaintiff if she wanted to make a formal complaint. Plaintiff, concerned about exacerbating the hostile treatment, said not at the present time.

68.    Plaintiff did ask Smith to look into why she still had not received her accommodation request of the assistive phone device.  Plaintiff had been waiting for months with no word on receiving the iPhone that had been requested for her.

69.    Upon information and belief, Schlosser was aware that Plaintiff had spoken to Smith (HR) about her complaints.

**Ongoing Discrimination, Complaints, and Retaliation for Complaints**

70.    Soon after Plaintiff's meeting with HR, Schlosser's picayune and unfair criticism of Plaintiff's work escalated, in frequency and intensity, and Schlosser continued to do it publicly.

71.    Plaintiff became aware that Schlosser was using other co-workers to monitor and harass her.  For instance, Schlosser called Plaintiff into her office where she was informed of mistakes that were caught by someone else. On several occasions, Plaintiff returned to her desk to find co-workers rifling through the paper bins on her desk, her filing cabinet, and the books on her desk, which was not characteristic in the office or done to others.

72.    Schlosser told Plaintiff, in sum or substance, that her work "had to be perfect" because she had no time to correct Plaintiff's mistakes, despite admitting to Plaintiff that she had not even finished fully training her.

73.    In or around January 18, 2022, Schlosser pulled down a training manual from a shelf in her office and referred to it. Plaintiff was surprised as she had requested just such a manual

during her initial training, due to her disability, and Schlosser said there was not one. Now Schlosser claimed that she made this one for herself when learning the position, and if Plaintiff wanted one, she had to make her own.

74.    Plaintiff asked Schlosser why she was suddenly being singled out as some problem worker who needed to be babysat by others.  Plaintiff stated that her practice when she caught mistakes made by others, was to quietly correct them.

75.    Several co-workers apologized to Plaintiff, seemingly upset by the direction they were receiving from Schlosser to invade her space and scrutinize her work for errors.

76.    Plaintiff believed Schlosser and Jaquin were setting up a reason to terminate her because of her disability and her complaints of discrimination.

77.    As the harassment and discrimination continued, Plaintiff spoke to her union representative, Matthew Arendt ("Arendt"), to tell him about the failure to accommodate her, the hostile work environment, the meeting with Smith (HR), and the new retaliation that was occurring subsequent to her December 13, 2021, meeting with HR.

78.    Arendt was upset by the treatment Plaintiff described and asked permission to intervene by speaking with HR & Jaquin.   Plaintiff agreed he could do so.

79.    At all relevant times, Jaquin was the Director of the finance department, and in that capacity, had the authority to hire, fire, and affect the terms, conditions, and privileges of Plaintiff's employment.

80.    Soon after speaking with Arendt, on or about January 29, 2022, Plaintiff asked Schlosser a question regarding an invoice that was being split between two different purchase orders. Schlosser began publicly berating Plaintiff once again. Plaintiff interrupted and asked Schlosser to please speak to her like an adult.

81.     Schlosser responded in sum or substance, "Get in my office."  Once inside, Schlosser became very nasty and abusive.   Plaintiff calmly asked Schlosser again to speak to her like an adult.

82.     Schlosser angrily walked out of her office and yelled while in the public area of the office, in sum or substance, "That's it. We're going into Chuck's [Jaquin's] office." Plaintiff responded, "I'm sorry I cannot go anywhere with you yelling at me like I'm a child. You can go speak to Chuck first. I'm going back to my desk and he can come and get me when you're done."

83.     Around 11:00 a.m. that morning, Jaquin asked Plaintiff to report to his office.

84.     When Plaintiff arrived in Jaquin's office, both she and Jaquin were wearing face masks. Due to Jaquin's mask and his habit of speaking at a particularly low volume, Plaintiff initially had difficulty understanding his speech.

85.     Plaintiff asked Jaquin to lower his mask and speak more loudly. In response, Jaquin glared at Plaintiff before lowering his mask and proceeded to speak in a louder but extremely condescending tone.

86.     Jaquin first told Plaintiff that nothing was a secret in the building, an apparent suggestion that he knew about Plaintiff's conversation with HR. He further indicated that he was not happy that Arendt, the union representative, had come to speak to him regarding Plaintiff's complaints. Plaintiff asked why, as Arendt was just trying to help resolve what's going on related to her disability.

87.     Jaquin, fully aware of Plaintiff's complaints of disability discrimination, responded, in sum or substance, that if Plaintiff was not happy with the way things were, then she could leave.

88.     Plaintiff asked Jaquin how it could be that they made such an effort to bring her back on a

part-time schedule, but now they wanted her to leave. Jaquin conceded that Plaintiff's question was valid and that her training had not been completed.

89.     In discussing the matter in more detail, Jaquin defended Schlosser's actions. Plaintiff left the meeting feeling under attack, that she was not viewed as being part of the team, and that as a person with a hearing disability, she was a burden.

90.     Later the same afternoon, at approximately 3:00 p.m., Jaquin approached Plaintiff's desk and again glared at her when she reminded him to lower his mask so that she could see his lips to better understand his speech. Through gritted teeth and in front of everyone in the office, Jaquin suggested a possible solution to the phone accommodation issue. He suggested that the County could block her phone number so it did not appear on caller ID when she called a vendor. Plaintiff said that the issue remained that she was being asked to use her personal cell phone for County business without compensation.

91.     Realizing that her complaints to Schlosser, Jaquin, and HR were not going to improve her discriminatory work environment, Plaintiff filed a formal written complaint of disability discrimination with the County of Suffolk on January 31, 2022.

92.     On or around February 8, 2022, Plaintiff approached Schlosser to request further feedback on her performance and acquire insight into how she could improve to please Schlosser.

93.     Later that same day, Plaintiff spoke with Arendt to inform him of additional scrutiny she was receiving and evidence that Schlosser was now redistributing her work to others. Arendt informed her that he too was concerned as he had tried multiple times to speak with HR and Jaquin, but they were refusing to speak to him.

**Discriminatory and Retaliatory Termination**

94.     On February 9, 2022, Jaquin called Plaintiff into an impromptu meeting with Smith and

terminated her employment.  Plaintiff was provided a letter signed by the Suffolk County Deputy Commissioner, dated February 8, 2022, stating her termination was effective February 9, 2022.

**Defendants' Discriminatory Actions and Conduct Under the Law**

95.    Prior to the illegal termination, Plaintiff was competently performing the essential functions of her job, and could have continued performing the essential functions of the job, with or without a reasonable accommodation.

96.    Defendants failed to ensure Plaintiff had the reasonable accommodations she requested and needed for her job.

97.    Throughout her employment, Plaintiff was subjected to a severe and pervasive disability-based hostile work environment by her supervisor, who had the authority to hire, fire and affect the terms and conditions of her work.

98.    Plaintiff was terminated due to her hearing disability and in retaliation for making a reasonable accommodation request and complaining of discrimination and retaliation.

99.    Defendants' actions and conduct were intentional and aimed at harming Plaintiff.

100.    Defendants knowingly and willfully discriminated against Plaintiff because of her disability, failed to grant her a reasonable accommodation as required by law, and illegally terminated her employment in retaliation for Plaintiff making an accommodation request and then complaining of discrimination and retaliation.

101.    As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation, which such employment entails.

102.    Plaintiff has also suffered future pecuniary losses, emotional pain, suffering,

inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

103. Plaintiff has experienced severe emotional distress.

104. As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdictional limits of the Court.

105. Defendants are employers subject to the ADA and the NYSHRL.

106. At all relevant times, Plaintiff was an individual with a disability within the meaning of the ADA and the NYSHRL.

107. At all relevant times, Plaintiff was a qualified individual who could perform the essential functions of her employment with or without a reasonable accommodation as defined by § 12111(8) of the ADA.

108. At all times relevant, Plaintiff's disability substantially limited one or more major life activity within the meaning of § 12102(1)(A) of the ADA.

109. Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

110. As such, Plaintiff demands punitive damages against Defendants.

### AS A FIRST CAUSE OF ACTION
### DISCRIMINATION UNDER THE ADA

111. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

112. Plaintiff claims Defendants violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336), as amended, as these titles appear in volume 42 of the United States Code, beginning at Section 12101.

113. Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112 "Discrimination" states: "(a) General rule. - No covered entity shall discriminate

against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

114.  Defendants engaged in discriminatory conduct and practices as described herein on the basis of Plaintiff's hearing disability.

**AS A SECOND CAUSE OF ACTION**
**RETALIATION UNDER THE ADA**

115.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

116.  42 U.S.C. § 2000e-3(a) states that it shall be an unlawful employment practice for an employer:

> (1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, …

117.  The above section forbids retaliation for engaging in protected activity, including requesting a reasonable accommodation and complaining of discrimination.

118.  Defendants engaged in an unlawful discriminatory practice by terminating Plaintiff because she requested a reasonable accommodation for her disability and complained of discrimination, protected activities, under the law.

**AS A THIRD CAUSE OF ACTION**
**DISCRIMINATION UNDER THE REHABILITATION ACT**

119.  Plaintiff repeats and realleges every allegation made in the above paragraphs of this complaint.

120.  Plaintiff claims Defendants violated the Rehabilitation Act (Pub. L. 93-112), as amended, as titles appear in volume 29 of the United States Code, beginning at Section 701.

121.   Title 29 of the Rehabilitation Act, Chapter 16, Subchapter V, Section 794(a), states: "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance..."

122.   Defendants received federal financial assistance throughout the relevant time period.

123.   Defendants engaged in unlawful discriminatory practices by subjecting Plaintiff to a disability-based hostile work environment.

124.   Defendants engaged in unlawful discriminatory practices by creating and implementing a policy and standard for accommodation requests, that on its face, is contrary to law.

125.   Defendants engaged in unlawful discriminatory actions by terminating Plaintiff because of her disability.

## AS A FOURTH CAUSE OF ACTION
## RETALIATION UNDER THE REHABILITATION ACT

126.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

127.   42 U.S.C. § 2000e-3(a) states that it shall be an unlawful employment practice for an employer:

>    (1) to… discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, …

128.   The above section forbids retaliation for engaging in protected activity.

129.   Defendants engaged in unlawful retaliatory conduct by terminating Plaintiff's employment because she made a disability-based accommodation request, a protected activity.

## AS A FIFTH CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYSHRL

130.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this Complaint.

131.    The New York State Executive Law § 296(1)(a) provides that,

> It shall be an unlawful discriminatory practice: For an employer …
> because of an individual's … disability… to refuse to hire or employ
> or to bar or to discharge from employment such individual or to
> discriminate against such individual in compensation or in terms,
> conditions or privileges of employment.

132.    Defendants engaged in unlawful discriminatory practices in violation of the New York

State Executive Law § 296(1)(a) by creating and maintaining discriminatory working

conditions and otherwise discriminating against Plaintiff because of her hearing disability.

## AS A SIXTH CAUSE OF ACTION
## RETALIATION UNDER THE NYSHRL

133.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this Complaint.

134.    The New York State Executive Law § 296(1) (e) and (h) forbid retaliation for engaging in

protected activity.

135.    Defendants engaged unlawful discriminatory practices in violation of the New York State

Executive Law § 296(1)(e) and (h) by terminating Plaintiff because she requested a

reasonable accommodation for her disability and complained of discrimination, protected

activities under the law.

## JURY DEMAND

136.    Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.      Declaring that Defendants engaged in unlawful employment practices prohibited by the ADA, and the NYSHRL by discriminating against Plaintiff on the basis of her disability;

B.      Awarding damages to the Plaintiff, retroactive to the date of her discharge for all lost wages and benefits resulting from Defendant's unlawful termination of her employment and to otherwise make her whole for any losses suffered as a result of its unlawful employment practices;

C.      Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D.      Awarding Plaintiff punitive damages;

E.      Awarding Plaintiff attorneys' fees, costs, interests, and expenses incurred in the prosecution of the action;

F.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.


Dated:   New York, New York
             October 3, 2022

                                        **PHILLIPS & ASSOCIATES,**
                                        **ATTORNEYS AT LAW, PLLC**


                                        Michelle A. Caiola, Esq.
                                        *Attorney for Plaintiff*
                                        45 Broadway, Suite 430
                                        New York, New York 10006
                                        T: (212) 248-7431
                                        F: (212) 901-2107
                                        mcaiola@tpglaws.com